1:09 MJ 4012

## AFFIDAVIT

I, William F. Hall, am duly sworn under oath, state as follows:

I am employed as a Special Agent of the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), and have been so employed since 2000. My primary duties as an ATF Special Agent consist of investigating, and assisting in the prosecution of, criminal violations of the federal laws governing the possession, use and sale of firearms, including but not limited to, Title 18, United States Code, Sections 922 and 924. I am currently assigned to the Columbus Field Division's Cleveland Group II Field Office stationed in Independence, Ohio. My duties primarily involve the investigation of federal firearms offenses committed by members of street gangs and other organizations whose members engage in violent criminal activity. To the extent related to violation of federal firearms laws, I also investigate violations of the federal controlled substance laws, including, but not limited to, Title 21, United States Code, Sections 841, and 846, and the commission of violent crimes.

During my employment as an ATF Special Agent, I have received specialized training regarding, and have personally participated in, various types of investigative activity, including, but not limited to, the following: (a) physical surveillance; (b) the debriefing of defendants, witnesses, informants and other individuals who have knowledge concerning violations of federal firearms laws; (c) undercover operations; (d) the execution of search warrants; (e) the consensual monitoring and recording of conversations; (f) electronic surveillance through the use of pen registers and trap and trace devices; (g) the court-

authorized interception of both wire and electronic communications (i.e., Title III wiretaps); and (h) the handling and maintenance of evidence.

This Affidavit is made for the limited purpose of establishing probable cause in support of a Criminal Complaint alleging that ALEX REESE, also known as ("a/k/a") "TUNE-UP," JEFFREY HAMPTON, a/k/a "BAM," a/k/a "TONE," SIDNEY GARTH JR., and HUBERT HAYES, conspired to possess with the intent to distribute 5 kilograms or more of a mixture or substance containing a detectable amount of cocaine, a Scheduled II Narcotic Drug Controlled Substance, in violation of 21 U.S.C. § 846, and 21 U.S.C. § 841.

1. On or about January 27, 2009, your Affiant initiated an investigation into the activities of Alex REESE a/k/a "TUNE-UP" and Jeffrey HAMPTON a/k/a "BAM", a/k/a "TONE". This investigation is based on interviews and information obtained by your affiant.

2. On January 27, 2009 and February 2, 2009, your Affiant participated in an interview of an individual with information regarding alleged illegal activities being committed by individuals known as ALEX REESE a/k/a "TUNE-UP" and JEFFREY HAMPTON a/k/a/ "BAM" a/k/a TONE". On February 2, 2009, your affiant conducted a query of the NCIC records for HAMPTON and REESE and reviewed these records. HAMPTON'S criminal record shows multiple arrests for offenses such as drug trafficking and assault. HAMPTON'S NCIC records indicate that he has three prior felony convictions: Drug Trafficking, 2002; Possession of Drugs, 1998; and Drug

Trafficking, 1994.

3. REESE'S criminal record shows multiple arrests for offenses such as drug trafficking and drug abuse. REESE'S NCIC records indicate that he has five prior felony convictions: Drug Trafficking, 2002; Possession of Drugs, 1998; Drug Trafficking, 1995; Drug Abuse, 1993; and Drug Abuse, 1990. Your affiant noted that HAMPTON and REESE were listed as codefendants in two of the aforementioned cases in the years 2002 and 1998.

4. Beginning on or about February 5, 2009 and through February 18, 2009, consensually monitored and recorded telephonic calls occurred between REESE and individuals under the direction of your affiant. The content of these conversations involved determining REESE's interest in meeting with an individual to discuss a home invasion-style theft of multiple kilogram quantities of cocaine.

5. On February 18, 2009, REESE travelled to a hotel in the city of Middleburg Heights, Ohio, located in the Northern Judicial District of Ohio. REESE travelled to that location to meet with an individual who had identified himself to REESE as "LOKITO". "LOKITO" is the undercover identity of an ATF Special Agent (hereinafter referred to as "LOKITO") assigned to this investigation.

6. "LOKITO" told REESE of his role in a cocaine smuggling and distribution organization and explained how he usually transports multi-kilogram quantities of cocaine for the organization about once a month. "LOKITO" told REESE how he ("LOKITO") would receive a phone call the day before the organization wanted him to come pick up the cocaine. "LOKITO" provided details to REESE regarding how narcotics were stored and distributed from a variety of locations and how "LOKITO"

would be contacted to pick up his portion of the narcotics for further distribution. "LOKITO" told REESE that the narcotics were stored in a 'stash house' and "LOKITO" described the locations as residential. "LOKITO" informed REESE that there were usually between ten to fifteen kilograms of cocaine present at the location for distribution. REESE indicated he would be willing to participate in the theft of the ten to fifteen kilograms of cocaine in a "home invasion-style robbery." Your Affiant knows through his training and experience that stealing drugs from locations where drugs are stored is a common method used by criminal enterprises to obtain cocaine. A home invasion-style robbery is conducted by multiple individuals, generally armed with firearms, who enter a residence or location wherein drugs are stored, and steal the drugs.

7. "LOKITO" asked REESE if he had ever participated in this type of criminal activity. REESE asked "LOKITO" if he meant taking something (rob). REESE nodded his head up and down in an affirmative manner and said, "Yeah, I did it 3, 4, 5 times, I've been doing this for a long time." REESE indicated he would be able to recruit other persons to participate. During the meeting REESE said he has "goons" to get the job done. REESE said this was not too much for him and his "crew" to handle. After several recorded telephone calls an additional meeting between REESE and "LOKITO" was agreed upon for the following day.

8. On February 19, 2009, "LOKITO" met with REESE and HAMPTON at a hotel located in Cleveland, Ohio. HAMPTON introduced himself as "TONE." During the meeting, REESE and HAMPTON agreed to participate with each other and others in the theft of the ten to fifteen kilograms of cocaine. REESE and HAMPTON also

indicated they had the ability to distribute that amount of cocaine once they possessed it. "LOKITO" asked if REESE and HAMPTON brought any other persons with them to discuss the theft of cocaine. REESE said they did not want to bring the "crew" to the hotel. HAMPTON then advised "LOKITO" he had an "army." HAMPTON and REESE said that when they hit the house they will have to "come in blazing". Your Affiant knows based on his training and experience this phrase refers to the use of firearms.

9. REESE and HAMPTON discussed various methods for gaining entry, securing the occupants, and locating cocaine within the residence. HAMPTON said they would use six to eight cooperators to conduct the theft of cocaine; two for outside cover in case the people on the inside of the house had lookouts on the street corner and six inside with some searching and others watching over the occupants. HAMPTON said as they entered the residence they would yell "police search warrant" to catch the people inside off guard. HAMPTON and REESE questioned how many individuals would be inside the residence, the occupants' physical size, if they carried guns, and where the cocaine would be stored. REESE discussed that the occupants, including "LOKITO," would be tied up.

10. On or about March 3, 2009, "LOKITO" spoke to REESE several times on his cellular telephone. These calls were consensually monitored and recorded. REESE confirmed that he and others were prepared to conduct a home invasion robbery of ten to fifteen kilograms of cocaine. "LOKITO" told REESE that he would be picking up the cocaine within 24 hours.

11. On or about March 4, 2009, REESE, HAMPTON, and two other individuals met

"LOKITO" at a parking lot located in Cleveland, Ohio. REESE and HAMPTON arrived in a white SUV occupied by two other individuals. REESE and HAMPTON exited their vehicle and entered "LOKITO's" van. "LOKITO" confirmed that REESE and HAMPTON were prepared to, and arrived at the location, in anticipation of immediately conducting the theft of cocaine. REESE and HAMPTON indicated they were prepared to execute the plan. "LOKITO," REESE, and HAMPTON also discussed how to split the proceeds of the cocaine. After several minutes, HAMPTON exited the Undercover Vehicle (UCV) and returned to the SUV. REESE stayed in "LOKITO's" vehicle. "LOKITO" and REESE drove to a location a short distance away followed by HAMPTON who drove the white SUV and two other individuals.

12. Both vehicles entered a commercial storage facility. HAMPTON, and the two other occupants of the white SUV exited and approached "LOKITO's" van. HAMPTON remained at the passenger side of the van while leaning into the window. REESE and the two other individuals were inside the van. The two individuals were subsequently identified as HUBERT HAYES and SIDNEY GARTH. HAYES entered the van wearing a ski mask over his head and face. "LOKITO" stated that they were about to steal twenty kilograms of cocaine and "LOKITO" said he wanted to be sure they understood what they were doing. "LOKITO" also asked all four if they thought this was too much to handle. REESE, HAMPTON, GARTH, and HAYES were given the opportunity to withdraw from the planned robbery of cocaine, none of the four indicated a desire to withdraw. In response, GARTH stated, "we're here." "LOKITO" then discussed that the proceeds of the cocaine were to be split evenly among

them. GARTH indicated that "LOKITO" would have "to come to them" to receive his share of the proceeds.

13. Shortly thereafter, REESE, HAMPTON, GARTH, and HAYES were apprehended by law enforcement. At the time of apprehension three firearms were recovered. A loaded handgun was recovered on the ground in front of their vehicle and a loaded rifle and loaded shotgun were recovered from the rear of the SUV in which all four had been riding.

14. A review of GARTH's criminal history indicates the following convictions: Aggravated Assault 1990; Felonious Assault 1990; Possession of Drugs 1998; Aggravated Assault 2002; Carrying a Concealed Weapon 2004; and Drug Trafficking 2006.

15. A review of HAYES' criminal history indicates the following convictions: Drug Abuse 1989; Trafficking 1990; Felonious Assault with Specifications 1990; Robbery 1990; and Robbery 2002.

## Conclusion

WHEREFORE, Affiant submits that the foregoing evidence establishes there is probable cause to believe that each of the named defendants violated the offenses described above and the criminal complaint to which this affidavit is attached.

FURTHER AFFIANT SAYETH NOT.

_____
William Hall, Special Agent
Bureau of Alcohol, Tobacco, Firearms and Explosives
United States Department of Justice

see next page

SUBSCRIBED AND SWORN TO BEFORE ME
this 5th Day of March , 2009.

_____
Nancy A. Vecchiarelli
United States Magistrate Judge